## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| ERIC BLEDSOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 2:17-cv-02390-TLP-tmp |
| v. | ) | |
| | ) | |
| CHERRY LINDAMOOD, SCCF Warden, | ) | |
| and ARVIL CHAPMAN, WCF Warden, | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER DISMISSING PETITION UNDER 28 U.S.C. § 2254, DENYING CERTIFICATE OF APPEALABILITY, CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Eric Bledsoe[1] petitions under 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody ("§ 2254 Petition"). (ECF No. 1.) Respondent answered (ECF No. 33), and Petitioner replied. (ECF No. 39.)

The issues Petitioner raises here fall into two categories: (1) whether the state court identified and applied the correct federal legal principles, and (2) whether his claim is barred by the procedural default doctrine. For the reasons below, the Court **DISMISSES** his § 2254 Petition.

---

[1] Petitioner is an inmate at the Whiteville Correctional Facility ("WCF") in Whiteville, Tennessee. His Tennessee Department of Correction ("TDOC") prisoner number is 281676.

## BACKGROUND

### I.      Petitioner's State Court Procedural History

A Shelby County grand jury indicted Petitioner for one count of aggravated rape, one count of aggravated burglary, and one count of theft of property over $1,000.00.  (ECF No. 32-1 at PageID 128.)  Following a trial, the jury then convicted Petitioner of all counts.  (*Id.* at Page ID 157.)  The trial court sentenced him to an effective term of sixty-five years in prison.  (*Id.* at PageID 165–67.)

Petitioner appealed (*Id.* at PageID 171,  and the Tennessee Court of Criminal Appeals ("TCCA") affirmed his conviction.  *State v. Bledsoe*, No. W2012-01643-CCA-R3-DD, 2013 WL 3968780 (Tenn. Crim. App. July 31, 2013), *perm. app. denied* (Tenn. Nov. 14, 2013).  Then Petitioner sought relief in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101-122.  (ECF No. 32-16 at PageID 974–90; 1000-03.)  The post-conviction court conducted an evidentiary hearing and denied relief.  (*Id.* at PageID 1007–17.)  So Petitioner appealed that decision (*Id.* at PageID 1018), and the TCCA affirmed again.  *Bledsoe v. State*, No. W2016-00419-CCA-R3-PC, 2017 WL 1380022 (Tenn. Crim. App. Apr. 13, 2017), *perm. app. denied* (Tenn. Aug. 18, 2017).

As a result, Petitioner sought post-conviction relief from the state court a second time.  (ECF No. 32-29 at PageID 1284.)  Again, the post-conviction court denied the petition and the TCCA affirmed.  *Bledsoe v. State*, No. W2017-01399-CCA-R3-PC, 2018 WL 1989612 (Tenn. Crim. App. Apr. 25, 2018), *perm. app. denied* (Tenn. Aug. 13, 2018).  Petitioner later sued here for habeas relief.  The Court now turns to the facts of Petitioner's case.

## II.      Factual Background

### A.      Facts Summarized on Direct Appeal

On direct appeal, the TCCA summarized the evidence presented at trial:

C. O.[2] ("the victim") testified that the incident took place on May 18, 2009. At the time, she was residing in a townhome at 303 Bishop Drive, Memphis, Tennessee.  The previous night the victim left her downstairs kitchen window partially open.  She awoke at approximately 5:00 a.m. to what she described as a "creeping noise."  The victim initially thought the noise was her young son moving around the house, but when she looked out of her bedroom door, she saw a man on all fours just outside her bedroom.  The intruder was dressed in a brown denim jacket, jeans, a red baseball cap with an "A" on it, and a "dewrag."  At trial, the victim identified the Defendant as the intruder who entered her home that night.

The victim testified that she did not react immediately upon seeing the Defendant because she was in shock.  When the Defendant realized he had been seen by the victim, he stood up, entered the bedroom, turned the lights on, and stood over the victim's bed.  The Defendant told the victim, "I'm not going to hurt you. I want some."  The victim understood his words to mean he "wanted sex," and she immediately began kicking and hitting him.  In response, the Defendant placed both hands around the victim's neck and choked her until she was unconscious.  When the victim regained consciousness, the Defendant was gone, and she noticed that her underwear had been pushed to the side.

After rearranging her underwear, she went to her son's room to make sure he was unharmed, and from her son's window she saw that her vehicle was missing. The victim then went downstairs to check the rest of her home and discovered that her car keys, student identification, some money, and her driver's license were missing from her purse.  She noticed her kitchen window was completely open, and the screen over the kitchen window was missing.  The victim called her mother and 911.  After police arrived at the scene, the victim was transported to the Memphis Sexual Assault Resource Center[3] ("the Rape Crisis Center"), where Dr. Amanda Taylor conducted a full physical examination of the victim.  The victim's injuries were photographed, DNA samples were taken for a rape kit, and she was given a Plan B pill.[4]  The underwear the victim had been wearing during the incident was kept by the Rape Crisis Center as part of the rape kit.  After leaving the Rape Crisis

---

[2] It is the policy of this Court [to] not use names of victims of sexual crimes.

[3] The authorities in Memphis changed the name of the Memphis Sexual Assault Resource Center to "the Shelby County Rape Crisis Center" after the attack.

[4] A Plan B pill is used "to prevent pregnancy following unprotected intercourse or contraception failure."  *Plan B Definition*, MERRIAM-WEBSTER.COM, http://merriam-webster.com/medical/plan%20b (Last visited June 27, 2013).

Center, the victim worked with a sketch artist to create a composite picture of her attacker, and she also gave a statement to police.

On cross-examination, the victim denied knowing the Defendant prior to the attack. When questioned about why she failed to state, in a written statement made during a photo identification three days after the crime, that the Defendant had assaulted or sexually assaulted her, the victim testified that she still was too distraught and that she already had told the police that she had been sexually assaulted.

Dr. Amanda Taylor, a sexual assault nurse examiner at the Rape Crisis Center, testified as an expert witness in forensic nursing and sexual assault examinations. The victim arrived at the Rape Crisis Center at 9:30 a.m. on May 18, 2009. Dr. Taylor explained that the procedure following a victim's arrival at the Rape Crisis Center is to first talk to the patient with an advocate present, then to do a full physical examination, collect "labs," administer medications, and collect a rape kit. Any injuries a victim might have are photographed. In this case, the victim had injuries both to her neck and thighs, and they were fresh injuries at the time of the physical examination. The victim also had a genital examination, which involved both an internal and external examination. The victim did not have any injuries to her genitals. Dr. Taylor testified that women commonly do not have any genital injuries after being sexually assaulted and that 80% of sexual assault victims do not show injuries in their genital area. Dr. Taylor collected a rape kit consisting of four swabs from the victim's mouth for baseline DNA, four swabs from the "vulvar area," and four swabs from the internal genital area. The kit also included the victim's underwear. Dr. Taylor testified that, after a kit has been collected, all of the evidence is sealed and sent to the Tennessee Bureau of Investigation ("TBI") for analysis. The kits are kept in a secure location until they are transported to the TBI.

On cross-examination, Dr. Taylor explained that the advocate who is present during the initial interview at the Rape Crisis Center is there to explain to a victim the legal proceedings involved. The advocate is not present for the medical exam. Dr. Taylor confirmed that the victim did not have any injuries to her genitals and that she could neither confirm nor negate sexual abuse had taken place. The victim's statement taken at the Rape Crisis Center did not include anything about her underwear being awry after she recovered from unconsciousness. On redirect, Dr. Taylor confirmed the victim's injuries were consistent with the statement the victim gave at the Rape Crisis Center.

Dyane Karl, a forensic technician with TBI, testified that it is her job to receive and label evidence and then place it in the TBI's vault until it is ready to be analyzed. Karl testified that the TBI will not accept evidence that is either unsealed or not delivered by law enforcement. She received the sealed rape kit taken from the victim's examination from Hyun Kim, a Memphis Police Department ("MPD")

officer.[5]   Karl testified that Francesca Sanders, who also worked as a forensic technician at TBI, received the DNA standard swabs of the Defendant from Officer Kim.

Donna Nelson, a special agent forensic scientist assigned to the serology DNA unit with the TBI, testified as an expert witness in the area of DNA analysis. Her job at the TBI was to process evidence for DNA and test any DNA evidence for possible matches.  After receiving the rape kit, Special Agent Nelson first tested the vaginal swabs for the presence of semen.  The vaginal swabs tested negative for the presence of semen.  The vulvar swabs were then tested for the presence of alpha amylase, an enzyme found in saliva.  The tests returned positive results for the presence of alpha amylase.  Because alpha amylase is found in other substances, its presence only indicates the possibility of the presence of saliva, and is not conclusory.  The victim's underwear tested positive for the presence of semen, on the inside of the underwear, in the "front of the crotch area."  After these tests were performed, the evidence was returned to the TBI's evidence vault, and Special Agent Nelson requested a DNA standard from the Defendant.  The semen found on the victim's underwear was matched to the Defendant's DNA.  Dr. Taylor's report on the DNA test results stated that the "probability of an unrelated individual having the same DNA profile from either the African American, Caucasian, Southeastern Hispanic or Southwestern Hispanic population exceeds the current world population."

Marvin Pender, a supervisor at Memphis Police Communications, testified that the victim made an emergency call on May 18, 2009.  His testimony was based on a 911 chronology record.  The dispatcher initially classified the call as a "prowler call," but after talking with the victim, the dispatcher discovered the victim was sexually assaulted, and the call was changed to criminal assault.  A dispatch to the victim's home was made at 5:37 a.m.

Officer James Henderson of the MPD responded to the victim's 911 call first.  The victim told Officer Henderson that she had been sexually assaulted and that she suspected the intruder had entered her home through the open kitchen window.  Officer Henderson observed that the window was open and that its screen was on the ground outside.  He also noticed injuries on the victim's arm and neck. Officer Henderson took a description of the victim's assailant, and noted that her car, keys, and student identification had been stolen.

Officer David Galloway, a crime scene unit officer with the MPD, photographed the crime scene and processed the kitchen window's sill for fingerprints.  He also processed the window screen and sent it to the crime lab to be dusted for fingerprints.  The screen was not processed at the scene because

---

[5] Officer Kim's first name is spelled both "Hyun" and "Yon" in the record, but "Hyun" appears to be the correct spelling.

Officer Galloway determined that, due to the nature of the window screen, better fingerprints could be obtained in the crime lab.

Sergeant Roger Wheeler of the MPD was a part of crime scene investigation at the time of the incident. He obtained three fingerprints from the window screen, and sent those fingerprints to be examined by a latent print examiner.

Officer Archie Rudd of the MPD received a call over his radio to be on the lookout for the victim's Jeep. A vehicle matching the description was located on the lot of a Mapco. A witness at the scene informed Officer Rudd that a black male had been attempting to change the tire on the vehicle. The Jeep was still on a jack when officers arrived on the scene, and a tire was pushed under the vehicle. After talking to witnesses, Officer Rudd then went to a nearby McDonald's. He attempted to use the restaurant's surveillance cameras to identify the suspect and also located another tire from the Jeep in a dumpster behind the McDonald's. Officer Rudd then returned to the Jeep and had it towed to the city impound lot. Officer Rudd testified that either he or his trainee was the one to fill out the paper work for towing the Jeep. Officer Rudd testified that he stands over his trainees' shoulders and makes sure any paperwork they fill out is correct.

Sergeant Ricky Davison of the MPD testified that he processed the victim's Jeep after it was towed. He photographed the vehicle and also dusted the exterior for fingerprints. The photographs were taken before and after he dusted the outside. Sergeant Davison found fingerprints on the exterior of the passenger door. The Jeep's rear view mirror had been torn off, and it was located on the rear passenger floorboard. Sergeant Davison obtained fingerprints from the rear view mirror.

Martin Milner, a civilian employee of the MPD's crime scene investigation latent print unit, testified as an expert in latent print examination. Milner received all of the fingerprint evidence collected by MPD officers from the crime scene and from the victim's Jeep. Milner determined that seven of the fingerprints collected by law enforcement officers were "of value." The fingerprints of value were then compared to known fingerprints using the automated fingerprint identification system ("AFIS"), a computerized database of known fingerprints. The AFIS returned a single identification number, 248804, as a match to the fingerprints taken from the crime scene. This number had previously been assigned to the Defendant. Milner manually compared the fingerprints after they were scanned using the AFIS. Two fingerprints from the torn rear view mirror matched a known print of the Defendant on more than ten points of comparison. A thumb print taken from the victim's window screen matched the Defendant's known fingerprint on seven points of comparison. A palm print taken from the passenger door of the victim's vehicle matched the Defendant on six points of comparison. Milner testified that he preferred not to make a comparison with less than five points of comparison matching and that he felt very comfortable in saying there was a match when seven points of comparison matched. He did not like "to go below five" points of comparison when identifying matching fingerprints.

On cross-examination, Milner confirmed his preferences for the number of matching points when making an identification. Milner stated that he would still report an identification between fingerprints when only four points matched but explained that four matching points neither confirmed nor negated a match.

Debra Finley, a fingerprint technician working for the Shelby County Sheriff's Office, testified as an expert witness in fingerprint identification. She testified that fingerprints taken from the Defendant the day of the trial were the "exact same" as the fingerprints already on file for the Defendant on between seven to ten different comparison points. The file number attached to the previously known fingerprints was 248804. The comparisons were made using the right thumb print and the right index finger. On cross-examination, she admitted there are more than ten points for comparison when identifying fingerprints.

Mark Workman, a composite layout artist with MPD's photo laboratory, testified that he developed a sketch of the victim's assailant during an interview with the victim in his office based on the description given to him by the victim. Workman's process is to begin creating a sketch using a description given to him without looking at photographs. He continuously shows the image to whoever is describing the person until they do not wish to make any more changes. Once the picture is complete, it is sent to the investigating officer.

Lieutenant Angela Smith of the MPD was the lead investigator on the case. At the time of the investigation, she held the rank of sergeant. Lieutenant Smith responded to the victim's home, and she also responded when the victim's Jeep was found. She took the victim's statement after she had been examined at the Rape Crisis Center, and she was also responsible for circulating the composite sketch of the suspect. After the fingerprints taken at the crime scene and from the Jeep were matched to the Defendant's fingerprints, Lieutenant Smith created a photo array that included a photo of the Defendant and presented it to the victim. The victim identified the Defendant from the photo array.[6]

After the Defendant was arrested, Lieutenant Smith interviewed him, took his statement, and obtained a DNA swab. Lieutenant Smith testified that the Defendant was aware of his rights when he gave his statement. The Defendant's statement included the following:

> I open the window up went in and I was looking around and I went upstairs and in this room and when I got in the room the lady woke up and I start talking to her asking her questions and stuff and when I got in the room I seen [sic] her butt naked then I started

---

[6] The photograph of the Defendant included in the array was from a previous arrest. The trial judge ruled that, while the photo array was admissible, the jury could not be informed how Lieutenant Smith obtained the photo of the Defendant.

talking to her asking where her boyfriend was and what she was doing naked. Then she told me he had just left then we were still talking and I asked her if she could give me a few dollars to get something to eat cause I was high then she started screaming and stuff and I told her don't be yelling cause [sic] I wasn't going to do anything to her and then yelling and kicking and then she kicked me in my stomach and I grabbed her leg and tried to calm her down then she swung at me so after that I opened her legs up and had sex with her but I took it out before I had ejaculated. I took it out and did it on the bed I didn't have a condom on when I left out of there I got her keys from off the table and drove off.

When the Defendant was asked if there was anything else he wanted to add to his statement, he stated, "I really apologize for what I did because I wasn't in my right mind, I sorry [sic] I did [sic] her like that that is not me."

Officer Andy Hurst of the MPD worked in the sex crimes division at time of the incident. He was asked by then-sergeant Smith to help her take a statement from the Defendant. Officer Hurst testified that the Defendant never appeared to be confused, "out of his mind," under the influence, or uncooperative during his police interview. At one point during the interview, the Defendant asked Lieutenant Smith to leave the room. After she had left the interview room, the Defendant immediately began crying and stated it "wasn't like him" to do what he had done. The Defendant blamed his actions on the "pills and alcohol" that he had consumed. After this admission, Officer Hurst determined it would be best to get a statement from the Defendant, and he notified Lieutenant Smith to return to the interview room so they could take the Defendant's statement. On-cross examination, Officer Hurst testified that the statements the Defendant made while Lieutenant Smith was absent from the room were not included in his written statement because they were "covered in the narrative."

The Defendant did not testify, and the defense did not call any witnesses.

The jury convicted the Defendant of one count of aggravated rape, one count of aggravated burglary, and one count of theft of property over $1,000. After a subsequent hearing, the trial court sentenced the Defendant to an effective term of sixty-five years in the Tennessee Department of Correction. The trial court denied the Defendant's timely-filed motion for new trial, and the Defendant timely filed his notice of appeal. The only issue raised on appeal by the Defendant is the sufficiency of the evidence supporting his rape conviction on the element of penetration.

*State v. Bledsoe*, 2013 WL 3968780, at *1–6.

**B.      Facts Summarized on Post-Conviction Appeal**

On post-conviction appeal, the TCCA summarized the evidence presented at the post-conviction hearing and the decision of the post-conviction trial court:

>    I. May 28, 2015 Post–Conviction Hearing

>    On May 28, 2015, the Petitioner explained that he had concerns regarding his trial counsel's representation.  The Petitioner claimed that he did not speak with trial counsel regularly, claiming that they spoke "mainly when [the Petitioner] came to court and a couple of times [when trial counsel] came to the jail."  The Petitioner said that trial counsel visited him "twice" while he was in jail.  He asserted that there were matters trial counsel told the Petitioner he was working on, but the Petitioner never received updates from him.  He contended that trial counsel "left [him] in the dark" on matters concerning his case.

>    The Petitioner also testified that he had concerns regarding the victim's testimony about the Petitioner and her relationship with him.  The victim asserted that she had never met the Petitioner, but he claimed that he and the victim knew each other prior to the night of the attack.  He said that he informed trial counsel that he and the victim were "in a pre-existing relationship" and that he had "moved out" of her home.  The Petitioner insisted that he and the victim were "[b]oyfriend and girlfriend."  The Petitioner explained that he would have called witnesses to testify at trial regarding his relationship.  He claimed that he wrote a letter to his trial counsel in which he asked trial counsel to contact Veronica White, James Bledsoe, and Lois Bledsoe about testifying at his trial.  However, according to the Petitioner, he never received a response to this request from his attorney.

>    When asked if he had the opportunity at trial to confront the victim about her truthfulness, the Petitioner responded "[n]o" and explained that "[trial counsel] never asked [him] anything" about what the victim "stated."  He further explained that if trial counsel had "subpoenaed witnesses that [the Petitioner] asked [trial counsel] to call on [his] behalf to testify that [he and the victim were] together" and that they had "seen [them] together and know[n] that [they were] staying together, [then trial counsel] would have known that [the Petitioner] and [the victim] had a relationship."

>    Additionally, the Petitioner testified that he suffered from mental illness.  He explained that he had "PTSD, paranoid schizoaffective disorder, depressive disorder, and probably substance dependence."  The Petitioner agreed that he had received a mental health evaluation prior to his trial but explained that he had trouble understanding the process and his evaluator "got frustrated with [him]."

>    Furthermore, the Petitioner claimed that trial counsel "never brung [sic] up [his] mental illness that [he] told [trial counsel] about."  He insisted that his mother,

Lois Bledsoe, could have verified that he suffered from mental illness. The Petitioner stated that he relayed this information to trial counsel, but never got a reply from him. The Petitioner explained that he had dealt with mental illness problems "[s]ince [he] was a kid" and agreed that "in order to function" he had "to have [his] medication." Additionally, the Petitioner stated that his medication had been "upgraded" during his time in jail regarding this incident.

The Petitioner also expressed concern about how trial counsel handled "statements he might have made during the time that he was under the influence" and "wasn't on [his] medicine." He explained that at the time he was arrested, he had not been taking his medication. He stated that when the police began talking to him, he "told them that [he] was not in [his] right mind[,]" that he "was under the influence[,]" and that he had not taken his "medicine and [he] needed to see a psychologist[.]" When asked how the police responded to his assertions, the Petitioner stated that "[t]hey never even tr[ied] to help [him.]" He asserted that he had informed his trial counsel of this information and that he "wanted [trial counsel] to file a motion for suppression and he never filed it." The Petitioner agreed that at trial, his counsel asked the interrogating officers during cross-examination about their interview with the Petitioner, and the Petitioner claimed that the officers responded that "they never really ask people about their mental health history[.]"

## II. July 10, 2015 Post–Conviction Hearing

On July 10, 2015, the post-conviction hearing continued. On cross-examination, the Petitioner was asked to explain what happened on the night of the incident involving the victim. The Petitioner testified that he was at the victim's home that night, and that he arrived around 11:00 p.m. He said that he "used [his] key" and "walked right in" the "front door[.]" The Petitioner asserted that the victim was expecting him. He explained that once he was inside the home, he "took . . . a shower and laid down." The Petitioner stated that after he had taken a shower, his "baby mama, [Veronica White,] called [him] about [his] daughter." He said that after he received this phone call from Ms. White, the victim "flipped out[,]" and they "start[ed] arguing[.]" He explained that as they were arguing, the victim "put her hands" on the Petitioner, and they "started wrestling[.]" He claimed that the victim "started kicking [him] and hitting [him] and [he] was trying to leave." He said that he "blacked out and the next thing [he knew], [he was] choking her." He agreed that he "put [his] hands around her throat" and "choke[d] her until she was unconscious." The Petitioner averred that this happened "on the bed in the bedroom" and that after he choked the victim he left the house. He explained that he left the victim's house that night "in her truck" and then went to the home of his brother, James Bledsoe. He explained that he stayed with his brother "when [he] and [the victim got] into it."

Additionally, the Petitioner claimed that he had a sexual relationship with the victim but that they did not have sex on the night of the incident. However, he claimed that he had sex with the victim "three days prior." Furthermore, the

Petitioner stated that he had taken "Loxapine," and had used "marijuana" and "heroin" on the day of the incident.  He also agreed that he had been "drinking alcohol that night."  According to the Petitioner, he was arrested on May 21, 2009.

The Petitioner testified that upon being arrested, he gave a statement to law enforcement officers at the police station.  He explained that he "didn't talk to [the officers] until they told [him] the only way [he] would be able to use the phone was if I talk[ed] to them about what went on."  When asked if the officers made threats, the Petitioner responded, "That's the only reason [he] talked to them."  He agreed that he made a statement to the police, that they typed it, and that he signed the typed copy.  He stated that he gave the statement "because [he] was tired and ready to go lay down" and because he wanted "to be able to call [his] family."  He claimed that he "never paid attention" to what was in his statement "because [he] was under the influence" of "marijuana, heroin," and "all type of stuff."  He further claimed that the "only thing [he] remember[ed] telling [the police] was that three days before" he and the victim "got into an altercation and [they] had sex."  He asserted that he told trial counsel about this interview but that trial counsel "never responded to [his] letters."

The Petitioner was questioned about the type of mental illness he suffered.  The Petitioner testified that he had "[m]ajor depression[,] PTSD, [a]nd paranoid schizophrenia."  He explained that at "eight or nine", he was diagnosed with major depression, at "eighteen" he was diagnosed with "PTSD[,]" and "in 2006, [he] was diagnosed with paranoid schizophrenia."  He asserted that he had taken the following medications for these conditions:  "Xanax, Seroquel, Lexapro, Celexa, Prozac," "Thorazine," "Risperdal," and "Depakote."  He stated that he was currently taking "Zoloft, Benadryl[,] and Loxapine."  The Petitioner agreed that there were times in his life when he did not take his prescribed medications.  He explained that "[w]hen he couldn't get [his medications], that's the only time" he did not take them.  He acknowledged that he functioned "better" when he took his medications.

The Petitioner claimed that he discussed his mental health with the attorney who represented him while his case was in General Sessions court.  He conceded that he knew his attorney "submitted an order to the court to have [him] evaluated for [his] mental health issues" and admitted that he remembered meeting with "the doctors" who performed the evaluation.  However, when asked if he knew the results of his evaluation, the Petitioner asserted that he "never knew what . . . the outcome [was]."  The Petitioner denied being aware of a letter regarding his mental health evaluation addressed to the General Sessions judge, which stated that the Petitioner "was competent" and had "the ability to talk to [his] lawyer about [his] case."

The Petitioner agreed that the case proceeded after his first mental health evaluation.  He acknowledged that he had a preliminary hearing, his case was bound over to the grand jury, and then his case went to criminal court.  Additionally, the

Petitioner confirmed that he was appointed trial counsel when his case advanced to criminal court.  The Petitioner conceded that he discussed the previous mental health evaluation with his trial counsel and that trial counsel "decided to have [the Petitioner's] mental health status reviewed[.]"  The Petitioner admitted that trial counsel did this upon the Petitioner's request.  The Petitioner insisted that he never saw the results of this evaluation and that trial counsel never discussed it with him.

On re-direct, the Petitioner identified a document as his "mental health treatment plan."  He stated that the document explained what he was diagnosed with and claimed that he obtained this document by requesting it from the "prison facilities that offer mental health" treatment.  The report was entered into evidence in order to show that the Petitioner suffered symptoms of "depression[,]" "nightmares[,]" and "paranoia[.]"

The Petitioner's trial counsel testified that he was appointed to represent the Petitioner in this case.  Trial counsel testified that he had been practicing law since 1982 and that he had practiced criminal law since 1989.  In response to the Petitioner's testimony, trial counsel testified as follows:

> [The Petitioner] gave me—it was several jail visits by the way, I counted at least five jail visits, at jail property.  Mentioned the other day three, today two, but it was at least five.  He gave me the names of the [potential witnesses] he [had] mentioned today, telephone numbers.  I did not turn those numbers over to investigators to track down for two reasons.  One, I wanted to talk to them myself first and I left voicemails at the numbers given me. I had given [the Petitioner] my card any number of times.  I return all phone calls.  And two, the fact that he might have known her [had] nothing to do with consensual sex on the night alleged, the early morning hours of May 18th, 2009.

On cross-examination, trial counsel acknowledged that he remembered representing the Petitioner and that he remembered "submitting [the Petitioner] for a mental health examination."  He explained that he did this "[b]ecause [the Petitioner] had asked that and it [was his] understanding there, that they [were] a little more thorough when they [were] being evaluated for a criminal court judge[.]" He stated that he was not sure if that "was absolutely accurate or not[,]" "[b]ut just in case," trial counsel requested that the Petitioner receive a second mental health evaluation.  Regarding the results of the evaluation, trial counsel admitted that he did not "recall ever having sent any client a copy of those letters[,]" but he asserted that he informed the Petitioner that "the doctor said he was A–OK" and competent to stand trial.  Furthermore, he agreed that he informed the Petitioner that "whatever his mental health diagnosis" was, it would not have been "a defense to be used at trial."

Additionally, trial counsel testified that he kept the Petitioner informed on the status of his case.  Trial counsel asserted that he met with his client at multiple court dates and discussed what was occurring with the Petitioner.  Trial counsel also testified that he sent the Petitioner copies of discovery and kept him informed on developments in his case.  He again asserted that he visited the Petitioner in jail "at least five times."

Regarding the potential trial witnesses the Petitioner asked him to call to testify, trial counsel explained,

> [The Petitioner] told me on one of those jail visits that he had met [the victim] on Beale Street once.  I asked her about that on cross[-]examination and she denied it.  If any of these folks he had given me their names, if they had confirmed that, I would have called them in here.  I've called people to the stand five minutes after meeting them.  Whether [the prosecutor] would have let me get away with it or not, I don't know, but I would have tried.

Trial counsel insisted that he had "tried personally" to contact these individuals and insisted that "if anything had come of it, [he] would have asked an investigator to talk to [the potential witnesses]."  Furthermore, trial counsel did not "recall [the Petitioner's] ever saying [he and the victim] had cohabitated."  He testified that he informed the Petitioner that whether or not he knew the victim was "irrelevant to consent[.]"  He asserted that he asked the Petitioner if any of these individuals were present "the night [the victim] alleged this happened[,]" and the Petitioner told him that they were not there.  Furthermore, he testified that when alibi witnesses [were] family [members], he considered them "less reliable."  Despite potentially being less reliable, trial counsel claimed that if he "had thought it would have . . . gone to the issue of consent, mama, daddy, brother, cousin, [he] would have called them."

Trial counsel testified that the physical evidence offered at trial was consistent with the victim's version of events.  Trial counsel agreed that her testimony at the preliminary hearing, trial, and her statement to the police "were all very consistent."  Also, he averred that the Petitioner's "statement to the police and his story of the events that happened that night, were very consistent with [the victim's] version of events."  Trial counsel stated that he "believe[d the Petitioner] said in his statement he didn't know [the victim]."  Counsel also testified that when the victim "was asked to do the sketch [of her attacker], there was no picture of [the Petitioner] presented, and again, it was just spot on."  Trial counsel agreed that "physical evidence would have been consistent with her testimony of how she regained consciousness and what her situation was at that time."

Additionally, trial counsel explained that the defense theory at trial was that "there was no proof of [sexual] penetration."  On re-direct, trial counsel identified a document that was entered into evidence at the Petitioner's trial.  The document

contained mug shots of six individuals, one of which was circled.  There was a handwritten note signed by the victim, which stated, "This is the person that invaded my home, choked me, and stole my car."  The signed note was dated May 21, 2009.  Trial counsel testified that he used this document to support his trial strategy that "there was not penetration."

James Bledsoe testified and explained that the Petitioner was his "baby brother."  He stated that the Petitioner would often stay at his house.  When asked if he was "familiar with the Petitioner and the victim[,]" he replied that he knew "they had a few arguments over the phone."  On cross-examination, Mr. Bledsoe admitted that he had never met the person the Petitioner would argue with over the telephone.  Mr. Bledsoe could not remember exactly when it was that the Petitioner would come over to his house and use the telephone.

Mr. Bledsoe also confirmed that he did not testify at the Petitioner's trial.  When asked why, Mr. Bledsoe explained that no one called him and stated that he was supposed to have been "called by a lawyer[,]" but he never received a call.  He agreed that he did not attend the Petitioner's trial but testified that he visited his brother in jail "[p]lenty of times."

### III.  August 28, 2015 Post–Conviction Hearing

The post-conviction court continued the hearing to August 28, 2015.  On that date, Lois Bledsoe testified that she was the Petitioner's mother.  She stated that in May 2009, the Petitioner "had several girlfriends[.]"  She knew this because they went "to [her] house."  She agreed that she saw "several different girlfriends purporting to be [the Petitioner's] girlfriend that would drive to [her] house[.]"  She testified that she did not recall their names.

Additionally, the Petitioner offered further testimony.  The Petitioner testified that "if [trial counsel] would have filed the grounds that [the Petitioner] asked according to the defects in the indictment and trial court errors, [the Petitioner] would have probably had a better trial than [he] had."  The Petitioner agreed that he wrote to trial counsel "explaining the different things that [he] would have liked [trial counsel] to do."  The Petitioner identified a collective exhibit, which consisted of a series of letters the Petitioner sent to trial counsel.  The Petitioner explained that the document contained letters to his trial counsel making requests and letters to the "Board of Professional Responsibility" "complaining about [trial counsel's] not responding to [his] request[s]."  The letters were entered into evidence.

The Petitioner also raised additional claims at the post-conviction hearing related to a lack of his DNA from the rape kit, trial counsel's failure to retest the victim's underwear, and trial counsel's failure to strike a juror who had been a victim of a robbery.  However, he failed to raise those claims on appeal.  Thus, those issues are waived.  *See* Tenn. R. App. P. 36(a).

The post-conviction court subsequently denied the petition. In its order denying the Petitioner relief, the post-conviction court found that the Petitioner offered no proof to support his claim that his trial counsel should have called witnesses to establish that he had a prior relationship with the victim. In its order denying the petition, the court found that

> [The Petitioner] testified that he asked his trial attorney to call Veronica White, his brother James Bledsoe and his mother Lois Bledsoe at trial to show that he knew her, to impeach the victim's credibility. He claimed that although he did not have sex with the victim that night, he did have sex with her three nights before. No proof was offered by the [P]etitioner that he had ever met the victim prior to the rape other than his completely unsupported testimony. His mother, Lois Bledsoe, was called as a witness at the hearing, and could only testify that he had a lot of girlfriends during that time and she could not remember any of their names. Her testimony at trial, if she had been called, would have been completely irrelevant. His brother James testified that he never met the victim or knew her name, but was told by the [P]etitioner that the victim was the lady he had been arguing with on the telephone. This testimony would not have been allowed at trial as inadmissible hearsay. His brother also testified that the [P]etitioner mostly stayed with him for the three years prior to his arrest. The victim was consistent in her 911 call, her statement to first responders on the scene, in her formal statement to the police, in her preliminary hearing testimony and in her trial testimony that she woke up to find the [P]etitioner in her bedroom and had never met him before. She worked with a composite layout artist with the MPD to attempt to produce a portrait of the rapist. In the [P]etitioner's signed confession, he admitted that he did not know her. His trial attorney testified that the [P]etitioner told him that he had only met her once on Beale Street, never alleging that they had an ongoing relationship. Veronica White was never called by the [P]etitioner as a witness for the hearing, even though they apparently have a child together. In general, the only way a petitioner can establish that trial counsel's failure to interview or present a witness in support of his defense at trial inured to his prejudice is to present the witness at the evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court finds the [P]etitioner totally lacking in credibility on this issue, and finds that this allegation must fail for lack of any credible proof of deficient performance or prejudice to the [P]etitioner."

*Bledsoe v. State*, 2017 WL 1380022, at *5–10.

The Court now discusses the different legal standards that apply to Petitioner's claims.

## LEGAL STANDARDS

### I.   Standard for § 2254 Petitions

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts may grant habeas corpus relief for persons in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

#### A.   Exhaustion and Procedural Default

Under § 2254(b) and (c), federal courts generally may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner has first exhausted available state remedies by presenting the same claims to the state courts.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[7] each claim at all levels of state court review, up to the state's highest court on discretionary review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  A petitioner need not seek review by the highest state court, however, if the state has explicitly decided that state supreme court review is not an available state remedy.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).  And under Tennessee Supreme Court Rule 39, the petitioner need not seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies."  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

---

[7] For a petitioner to exhaust a claim, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it enough to "make a general appeal" to a broad constitutional guarantee.  *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

The procedural default doctrine is also related to § 2254's exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the "interplay" between the exhaustion rule and the procedural default doctrine). In sum, if the state court decides a claim on an independent and adequate state ground (such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim), the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotations omitted)).[8] That said, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

With that in mind, if a state court opinion bars a petitioner's claim under the procedural default doctrine, the petitioner's claim survives only if he shows: (1) cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation; or (2) that the federal court's failure to review the claim will lead to a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To show a fundamental miscarriage of justice, the petitioner must show that a constitutional error has "probably resulted" in the conviction of one who is innocent of the crime. *Schlup*, 513 U.S.

---

[8] "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. at 60–61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 60–61) (internal quotation marks and citations omitted).

at 321; *see also House v. Bell*, 547 U.S. 518, 536–539 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### B.   Merits Review

Under Section 2254(d), if the state court decided petitioner's claim on the merits, the federal court should only grant a habeas petition if resolving the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  The petitioner carries the burden of proof on this "'difficult to meet' and 'highly deferential [AEDPA] standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'"  *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

When reviewing a claim under § 2254(d)(1), the federal court is limited to the record before the state court that decided the claim on the merits.  *Cullen*, 563 U.S. at 182.  And a state court's decision is not "contrary" to federal law unless it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law, or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  In like manner, an "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 412–13.  So the state court's application of clearly established federal law must be "objectively unreasonable" for the court to grant habeas relief.  *Id.* at 409.  What is more, the habeas court

may not issue the writ just because, "in its independent judgment," the court determines that the "state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is not much case law discussing when a state court bases a decision on "an unreasonable determination of the facts" under § 2254(d)(2). In *Wood v. Allen*, the Supreme Court found that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."[9] 558 U.S. 290, 301 (2010). And in *Rice v. Collins*, the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." 546 U.S. 333, 341–42 (2006).

The Sixth Circuit also described the § 2254(d)(2) standard as "demanding but not insatiable." *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008)). But, the Sixth Circuit emphasized that, under § 2254(e)(1), a court should presume that the state court's factual determinations are correct, absent clear and convincing evidence to the contrary. *Id.* And so, a federal court should not overturn a state court adjudication on factual grounds unless the state court's decision is objectively unreasonable considering the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

---

[9] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) also requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. But the Court left that issue open "for another day." *Id.* at 300–01, 304 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006), in which the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) does not apply).

### C.     Ineffective Assistance of Counsel

#### i.     Right to Effective Assistance of Counsel

The standards stated in *Strickland v. Washington* control a claim that ineffective

assistance of counsel deprived a defendant of his Sixth Amendment right to counsel.  466 U.S.

668, 687 (1984).  To succeed on this claim, a movant must show that (1) counsel's performance

was deficient, and (2) "that the deficient performance prejudiced the defense."  *Id.*  "The

benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied on as

having produced a just result."  *Id.* at 686.

First, to establish deficient performance, the petitioner "must show that counsel's

representation fell below an objective standard of reasonableness."  *Id.* at 688.  And a court

considering such a claim must apply a "strong presumption" that counsel's representation was

within the "wide range of reasonable professional assistance."  *Id.* at 689.  The petitioner's

burden is to show "that counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.

Second, to show prejudice, a petitioner must establish "a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*

at 694.[10]  "A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  *Id.*  But "[i]t is not enough for the defendant to show that the errors had some

conceivable effect on the outcome of the proceeding."  *Id.* at 693.  Instead, counsel's errors must

be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at

---

[10] If a reviewing court finds no prejudice, it need not determine whether counsel's performance
was deficient.  *Strickland*, 466 U.S. at 697.

687; *see also Harrington*, 562 U.S. at 104 (citing *Strickland*); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) (stating that "*Strickland* does not require the State to 'rule out'" a more favorable outcome, but "places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

When reviewing an ineffective assistance claim that the state courts already considered, federal courts show deference to the state-court decision under 28 U.S.C. § 2254(d) .  As the Supreme Court said in *Harrington*,

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

562 U.S. at 105 (internal quotations and citations omitted).

### ii.     Right to Effective Assistance of Counsel on Appeal

A criminal defendant is also entitled to the effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  But counsel's failure to raise a nonfrivolous issue on appeal does not constitute per se ineffective assistance.  The Supreme Court held the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted).  So courts evaluate claims of ineffective assistance of appellate counsel using the *Strickland* standards.  *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief);

*Murray*, 477 U.S. at 535–36 (applying *Strickland* to appellate counsel's failure to raise issue on appeal).  This means that, to establish that appellate counsel was ineffective, a petitioner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them.  If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice.  That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Robbins*, 528 U.S. at 285 (citation omitted).[11]

In fact, appellate counsel's ability to choose which arguments are more likely to succeed is "the hallmark of effective appellate advocacy."  *Matthews v. Parker*, 651 F.3d 489, 523 (6th Cir. 2011) (quoting *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003)), *rev'd on other grounds*, 567 U.S. 37, 49 (2012).  For that reason, it is difficult for a petitioner to show that appellate counsel was deficient for raising one issue on appeal, rather than another.  *See id.*  "In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger than issues that counsel did present."  *Id.* at 524.  And the petitioner must also show that "there is a reasonable

---

[11] The Sixth Circuit has identified a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

    1.     Were the omitted issues "significant and obvious?"
    2.     Was there arguably contrary authority on the omitted issues?
    3.     Were the omitted issues clearly stronger than those presented?
    4.     Were the omitted issues objected to at trial?
    5.     Were the trial court's rulings subject to deference on appeal?
    6.     Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
    7.     What was the appellate counsel's level of experience and expertise?
    8.     Did the petitioner and appellate counsel meet and go over possible issues?
    9.     Is there evidence that counsel reviewed all the facts?
    10.    Were the omitted issues dealt with in other assignments of error?
    11.    Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

When the direct appeal ends, the right to counsel also ends.  In *Coleman v. Thompson*, the Supreme Court found that "[t]here is no constitutional right to an attorney in state post-conviction proceedings."  501 U.S. at 752 (internal citations omitted).  As a result, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."  *Id.*  What is more, attorney error cannot constitute "cause" for a procedural default, "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error."  *Id.* at 753 (internal quotation marks omitted).  So when the state has no constitutional obligation to ensure that a prisoner has competent counsel, the petitioner bears the risk of attorney error.  *Id.* at 754.

There is, however, a narrow exception to the rule in *Coleman*.  In *Martinez v. Ryan*, the Supreme Court considered an Arizona law that did not permit petitioners to raise ineffective assistance claims on direct appeal.  *Martinez*, 566 U.S. at 6.  The Court held that, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  566 U.S. 1, 17 (2012).  The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here," and "[i]t does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons."  *Id.* at 16.

23

To excuse a procedural default under *Martinez*, a petitioner must show that

(1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original). And, in its

later decision in *Trevino*, the Supreme Court extended its *Martinez* holding to states which have

a "procedural framework, by reason of its design and operation, [that] makes it highly unlikely in

a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective

assistance of trial counsel on direct appeal . . . ." 569 U.S. at 429. Thus, *Trevino* modified the

fourth *Martinez* requirement for overcoming procedural default. The Sixth Circuit has found that

both *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 790

(6th Cir. 2014).

The Court now considers Petitioner's § 2254 claims.

## II.    Petitioner's Federal Habeas Claims

Petitioner's § 2254 Petition raises these issues:

1.      That the evidence was insufficient to convict Petitioner of aggravated rape[12] ("Issue 1") (ECF No. 1 at PageID 4);
2.      Petitioner's trial counsel performed deficiently ("Issue 2") (*id.* at PageID 5–11); and
3.      The state failed to disclose what items the forensic center—West Tennessee Forensics—reviewed, violating *Brady v. Maryland*, 373 U.S. 83 (1963) ("Issue 3") (*id.* at PageID 11).

---

[12] Petitioner clarified in his reply that he challenges only the sufficiency of the evidence on his aggravated rape conviction. (ECF No. 39 at PageID 1415–17.)

The TCCA addressed Issue 1 on direct appeal.  (ECF No. 32-10 at PageID 863.)

Tennessee courts have not addressed the other issues.

## ANALYSIS OF PETITIONER'S CLAIMS

### I.      Issue 1: Sufficiency of the Evidence

Petitioner argues that the TCCA's conclusion that the evidence supported his conviction

for aggravated rape goes against the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S.

307 (1979).  (ECF No. 1 at PageID 4.)  Indeed, Petitioner claims that "the TCCA's terminology

under *Jackson v. Virginia* on [the] sufficiency of evidence were [sic] constitutionally misused

concerning the facts use[d] as evidence," and "penetration was never proved." (ECF No. 39 at

PageID 1416–17.)  Respondent replies that the TCCA's decision was not contrary to federal law

and was a reasonable determination of the facts.  (ECF No. 33 at PageID 1387–92.)

The TCCA ruled on this issue.  *State v. Bledsoe*, 2013 WL 3968780, at *6–8.

 And after reviewing the evidence presented at trial on the aggravated rape charge, the TCCA

found:

> Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e).  After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).
>
> The appellate court does not weigh the evidence anew.  Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State.  *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).  Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Id.*  (citation omitted).  This standard of review applies to guilty verdicts based upon direct or

circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. *Id.*

As charged in this case, aggravated rape is defined as the "unlawful sexual penetration of a victim by the defendant" and the defendant "causes bodily injury to the victim." Tenn. Code Ann. § 39–13–502(a)(2) (2006). The Defendant contends that the State failed to prove the element of penetration, arguing that no rational jury could have found that he penetrated the victim because it is clear from his confession and the physical evidence that the Defendant only engaged in "frottage"[13] with the victim.

We disagree. The State presented evidence that the victim's underwear had been moved to the side and that the Defendant's semen was found on the inside of the victim's underwear. The Defendant confessed that he "opened her legs up and had sex with her but [he] took it out before [he] ejaculated." If there are ambiguities in this statement, the jury resolved those in the State's favor when it returned a verdict of guilty on the aggravated rape count. The jury found that penetration took place during the crime, and this Court will not disturb inferences drawn by the jury. *See State v. Winters*, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003).

To the extent that the Defendant's argument could be interpreted to raise a corpus delicti argument, any such argument also fails. A defendant cannot be convicted on his or her confession alone. *See Ashby v. State*, 139 S.W.2d 872, 875 (Tenn. 1991). "The 'corpus delicti' refers to the 'body of the crime—evidence that a crime was committed at the place alleged in the indictment.'" *State v. Banks*, 271 S.W.3d 90 (Tenn. 2008) (quoting *Van Zandt v. State*, 218 Tenn. 187, 402 S.W.2d 130 (1966)). "[T]he State must present some corroborating evidence to establish the corpus delicti." *Id.* (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). When a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State*, 192 Tenn. 649, 241 S.W.2d 604, 606 (1951)). The State need present "only slight evidence . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281 (quoting *State v. Driver*, 634 S.W.2d 601, 606 (Tenn. Crim. App. 1981)). "Whether the [S]tate has sufficiently established the corpus delicti is primarily a jury question." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). "All elements of the corpus delicti may be established

---

[13] In this case we understand "frottage" to mean that the Defendant rubbed his penis on the victim, as opposed to engaging in intercourse.

by circumstantial evidence." *State v. Garmon*, 972 S.W.2d 706, 708 (Tenn. Crim. App. 1998) (citing *Clancy v. State*, 521 S.W.2d 780 (Tenn. 1975)).

The Defendant argues that there is no evidence of penetration other than his statement made to law enforcement officers that he had sex with the victim. The State, however, did present evidence that the victim's underwear had been moved to the side and that the Defendant's semen was on the inside of her underwear. This evidence clearly rises to the "slight evidence" requirement of our case law and is sufficient to corroborate the corpus delicti. We note also that corroboration is primarily a jury question, *see Jones*, 15 S.W.3d at 891, and the jury resolved this question in favor of the State.

We hold that the evidence is sufficient to support the Defendant's conviction of aggravated rape and that the Defendant is not entitled to relief on this basis.[14]

*State v. Bledsoe*, 2013 WL 3968780, at *6–8.

Here Petitioner fails to explain how the TCCA's decision contradicted *Jackson v. Virginia*. In *Jackson v. Virginia*, the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." 443 U.S. at 324. Applying this standard, a federal district court must examine the evidence in the light most favorable to the state. *Id.* at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

---

[14] We again note that the Defendant only challenges the sufficiency of the evidence as to the element of penetration. Therefore, we need not address the other elements of this offense.

Petitioner here repeats his argument about penetration that the TCCA considered and rejected.   So because he presented his claim that the state failed to prove the element of penetration to the TCCA, Petitioner exhausted that claim.

But he now tries to take it a step further by making a new argument—that the prosecution presented no evidence on the elements of force, coercion, or injury.  (ECF No. 39 at PageID 1415–17; ECF No. 32-10 at PageID 873–75.)  Petitioner did not challenge the sufficiency of the evidence to establish force, coercion, or injury on direct appeal.  *State v. Bledsoe*, 2013 WL 3968780, at *6–8.  And so Petitioner's claims challenging the sufficiency of the evidence establishing force, coercion, or injury are not exhausted.  And given the statute of limitations on state post-conviction relief, Petitioner has no remaining avenues in state court for relief on that point.  As a result, this procedural default operates as a complete and independent procedural bar to him bringing this claim now for federal habeas review of his claims that the evidence could not establish force, coercion, or injury.  He has lost the opportunity to question that part of his case.

The Court now turns to the single exhausted aspect of this claim.  Petitioner has not shown that the state court's resolution of the penetration element was objectively unreasonable.  As to penetration, the jury credited the testimony of the victim, expert witnesses, and Petitioner's own statement to police officers in which he admitted to engaging in sex with the victim.  *State v. Bledsoe*, 2013 WL 3968780, at *7.  What is more, the TCCA applied the correct legal rule and cited both *Jackson v. Virginia* and state cases applying the *Jackson* standard.  *Id.* at *6–8.  The TCCA also decided that the state's presentation of "evidence that the victim's underwear had been moved to the side and that the Defendant's semen was on the

inside of her underwear" was enough to corroborate his confession in support of the aggravated rape conviction.  *Id.* at *7.

And so, based on this Court's review of Petitioner's trial transcript (ECF Nos. 32-4, 32-5, 32-6, and 32-7), the TCCA correctly concluded that the testimony and evidence were more than sufficient to permit the jury to find that Petitioner was guilty of aggravated rape.  The Court therefore **DENIES** Petitioner's claim on Issue 1.

## II.    Issue 2: Ineffective Assistance of Trial Counsel

Petitioner next cites six instances of allegedly ineffective assistance by trial counsel.  (*Id.*) He argues that trial counsel failed to:

1.    Provide Petitioner with a proper mental examination (ECF No. 1 at PageID 5);
2.    Have Petitioner mentally evaluated for a second time after the first evaluation was biased and inconclusive (*id.*);
3.    Have the victim's panties inspected for DNA (*id.* at PageID 7);
4.    Suppress Petitioner's confession (*id.* at PageID 8);
5.    Object to the State's motion in limine that the parties should not ask the victim about prior sexual behavior (*id.* at PageID 9); and
6.    Challenge one juror and retain another juror (*id.* at PageID 10).

Respondent argues that the procedural default doctrine bars this claim because Petitioner did not raise these issues when he had an opportunity during his post-conviction appeal.  (ECF No. 33 at PageID 1393–99.)  The Court agrees with Respondent.

Petitioner raised all six issues in his post-conviction petition.  (ECF No. 32-16 at PageID 982–86; 1001.)  So Petitioner either presented evidence (or had the chance to present evidence) supporting his claims during the post-conviction hearing.  (*Id.* at PageID 1007.)  The post-conviction court, however, denied each claim.  (*Id.* at PageID 1014–16.)

Then Petitioner did not raise any of these six issues in his post-conviction appeal. Instead, his post-conviction appellate counsel raised a single issue of ineffective assistance—that

trial counsel was ineffective in failing to call potential defense witnesses during trial.[15]   (ECF No. 32-22 at PageID 1195, 1199–1202.)

It is true that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial."  *Sutton*, 745 F.3d at 787 (citing *Martinez*, 566 U.S. at 18).  But for a claim like this to qualify as "substantial" under *Martinez*, it must have "some merit" based on the controlling standard for ineffective assistance of counsel.  *Martinez*, 566 U.S. at 14.

The holdings in *Martinez* and *Trevino*, therefore, cannot excuse Petitioner's default of these ineffective assistance of counsel claims.  *Martinez* does not include claims that post-conviction appellate counsel was ineffective.  *See id.* at 15 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial- review collateral proceedings for claims of ineffective assistance of counsel at trial.")  In this case, the procedural default of Petitioner's ineffective assistance of counsel claims

---

[15] The post-conviction appellate brief included a single statement that "Petitioner had mental health issues, which could have easily explained his alleged 'confession' to police."  (ECF No. 32-22 at PageID 1201.)  The TCCA held that "Petitioner completely fail[ed] to support this allegation with argument," and "[t]hus, the issue is waived."  *Bledsoe v. State*, 2017 WL 1380022, at *11; *see* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b)."  Tennessee's waiver rule is an independent and adequate state procedural ground.  *Mathis v. Colson*, 528 Fed. App'x 470, 478 (6th Cir. 2013).  This means that, absent a showing of cause and prejudice or actual innocence, a state appellate court's application of the rule bars federal habeas review of a claim.  *See id.* (federal habeas review of petitioner's claim was barred where Tennessee appellate court refused to decide merits of claim because it was not "support[ed] . . . with argument or citation to authorities" in violation of Tenn. Ct. Crim. App. R. 10).  Petitioner does not acknowledge that this issue is now defaulted because he failed to comply with the state procedural rule.  What is more, he makes no attempt to establish cause or prejudice.  All in all, this issue is barred by procedural default because Petitioner did not properly preserve the issue in his post-conviction appeal.  And *Martinez* does not provide a basis for excusing the default of this claim because ineffective assistance of Petitioner's trial counsel had nothing to do with failure to brief an issue properly on appeal from denial of post-conviction relief.  The Court thus **DENIES** this claim.

occurred when post-conviction counsel used his discretion to limit his TCCA brief to a single

argument.  Appellate counsel has no duty to raise frivolous issues and may exercise his

discretion to limit a brief to the TCCA to the strongest arguments.  *See Matthews*, 651 F.3d at

523.  And so, Issue 2 is barred by procedural default and the Court **DENIES** Petitioner's claims

on these grounds.

III.    **Issue 3: Brady Violation**

Petitioner's habeas claims based on *Brady v. Maryland* are also barred by procedural

default.  In his amended post-conviction petition, Petitioner alleges that "West Tennessee

Forensics did not provide Petitioner, or trial defense counsel, with information detailing the

specific items that they reviewed in order to reach their conclusion" and that, "by not disclosing

what specifically this information was, Petitioner, or Petitioner's trial counsel, was in no position

to determine the accurateness of the conclusions reached, or to challenge it, if necessary, and this

made it impossible for Petitioner to receive the proper representation needed."  (ECF No. 32-16

at PageID 1002.)  Respondent replies that the procedural default doctrine bars this claim too.

(ECF No. 33 at PageID 1401.)  The Court agrees.

The post-conviction trial court addressed this issue solely as a claim of ineffective

assistance of counsel.  During the post-conviction hearing, Petitioner testified that he "never had

any recognition of what recommendation [West Tennessee Forensic Services] made concerning

[his] mental [state] because [he] never had copies of it, never was discussed about it or nothing

and so I never knew."  (ECF No. 32-19 at PageID 1089–90.)  Petitioner said he met with the

doctors, but he denied that trial counsel discussed the outcome of the second mental evaluation

with him.  (*Id.* at PageID 1095.)  Even so, the post-conviction court found that, because he

underwent mental evaluations twice and the doctors found him competent to stand trial,

Petitioner failed to show either deficient performance or prejudice.  (ECF No. 32-16 at PageID 1014.)

In sum, Petitioner did not allege a freestanding *Brady* violation during the post-conviction proceedings.  That means that Petitioner did not properly exhaust a *Brady* claim here. He did not present it to the Tennessee courts during the direct or the post-conviction appeal.  And so the procedural default doctrine bars Petitioner's Issue 3.  Also, given the statute of limitations on state post-conviction relief, this procedural default operates as a complete and independent procedural bar to federal habeas review of this claim.  As a result, the Court **DENIES** Petitioner's claim.

In the end, the issues raised in this petition lack merit and are barred by procedural default.  The Court therefore **DISMISSES WITH PREJUDICE** Petitioner's § 2254 Petition. The Court will enter judgment for Respondent.

## APPELLATE ISSUES

A petitioner is not always entitled to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003).  The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.  A petitioner may not appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

The Court may issue a COA only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must reflect the specific issue or issues that satisfy the required showing.  28 U.S.C. §§ 2253(c)(2)–(3).  A petitioner makes a "substantial showing" when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed more).

Nor does the petitioner have to show that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). But courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Miller-El* , 537 U.S. at 337).

Here, doctrines of procedural default bar Petitioner's claims. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

For the same reasons, the Court **CERTIFIES** under Fed. R. App. P. 24(a) that any appeal here would not be taken in good faith. Thus, the Court **DENIES** leave to appeal in forma pauperis.[16]

**SO ORDERED**, this 11th day of December, 2020.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[16] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).